**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Shiva N. VARMA, Defendant-Appellant.**

**No. 81–1925.**

United States Court of Appeals,
Tenth Circuit.

Oct. 12, 1982.

Stephen R. McCaughey, of Hatch & McCaughey, Salt Lake City, Utah, for defendant-appellant.

Francis M. Wikstrom, U. S. Atty., and Samuel Alba, Asst. U. S. Atty., Salt Lake City, Utah, for plaintiff-appellee.

Before HOLLOWAY and SEYMOUR, Circuit Judges, and KELLY,\* District Judge.

KELLY, District Judge.

Shiva N. Varma, M.D., was convicted by a jury in the United States District Court for the District of Utah on all four counts of an indictment that charged him with dispensing and distributing controlled substances without a legitimate medical reason in violation of 21 U.S.C. § 841(a)(1).[1]  The only contention raised by defendant on appeal is that there was insufficient evidence to sustain a finding of guilty beyond a reasonable doubt, and that the trial court therefore erred by not granting a motion for judgment of acquittal.

At all times relevant to this case, defendant, a licensed physician, was practicing medicine in Salt Lake City, Utah.  The charges against him are based on prescriptions for controlled substances that he wrote for four undercover Utah Public Safety Department Narcotic Enforcement Agents who visited his office in April 1981. The agents' uncontroverted testimony was as follows.

---

\* Of the United States District Court for the District of Kansas, Sitting by Designation.

1.  21 U.S.C. § 841(a)(1) provides, in part:
(a) Except as authorized by this title, it shall be unlawful for any person knowingly or intentionally—

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance . . .

Agent Richard E. Lubow went to defendant's office on April 2, 1981. After arriving at defendant's office his weight was measured on a bathroom-type scale, and he was asked to fill out a patient history form. He listed a post office box as his address and did not answer any questions on the form regarding allergies, other medications, prior serious illnesses and surgeries, or family medical history. He was then called into defendant's office and said that he needed Ritalin to stay awake while gambling at Las Vegas. Defendant refused to prescribe Ritalin for that purpose but said he would prescribe the drug to help Lubow stay awake while driving to Las Vegas, Nevada, from Salt Lake City. Defendant then cursorily examined Lubow with a stethoscope, although the agent had not taken off his flannel shirt and denim jacket. Defendant asked Lubow no questions regarding his medical history before prescribing 10 pills of 5 mg. Ritalin. The agent paid defendant $20.00 cash, but was not given the receipt that defendant wrote out.

Agent L. T. Cooper went to defendant's office on April 9, 1981. His weight, 155 pounds, was also measured on a bathroom-type scale. He told defendant that he wanted to lose 20 pounds and asked for Preludin, an appetite suppressant. Cooper saw defendant for a total of three to five minutes, and was cursorily examined with a stethoscope through his three layers of clothing. Cooper paid defendant $20.00 in cash and defendant wrote out a receipt but did not give it to the agent. The next day Cooper returned to defendant's office complaining that the Preludin kept him up at night. Defendant asked him what type of drug he wanted; Cooper requested Percodan, but defendant prescribed Dalmane. Cooper again paid defendant $20.00 cash but was given no receipt.

Agent C. Ray Openshaw also went to see defendant on April 9, 1981. He told defendant that he was working late at night and going to school during the day and consequently needed something to keep him awake while at his job. Openshaw specifically asked for Ritalin, which defendant prescribed. Defendant examined Openshaw with a stethoscope through the agent's long-sleeved shirt. The agent paid defendant $20.00 in cash and defendant made out a receipt but kept it.

The fourth count of the indictment was based on agent John Sauer's April 10, 1981, visit to defendant's office. Sauer told defendant that he had recently begun working on the loading dock of a trucking company from midnight until 8:00 a.m., and was having problems staying awake. He specifically asked for Dexedrine, which he said he had previously taken when another doctor had prescribed it for his hyperactive son. Defendant refused to prescribe Dexedrine but instead prescribed 20 tablets of 20 mg. Ritalin. The agent paid $20.00 in cash but did not receive a receipt.

■ In determining whether a motion for acquittal should have been granted, the appellate court must consider the evidence in the light most favorable to the government; the verdict will stand if supported by substantial evidence. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Smurthwaite,* 590 F.2d 889, 891 (10th Cir. 1979). In order to obtain a conviction under 21 U.S.C. § 841(a)(1) against a physician, the prosecution must show:

(1) That defendant distributed a controlled substance;

(2) That he acted intentionally or knowingly; and

(3) That defendant prescribed the drug without a legitimate medical purpose and outside the usual course of professional practice.

*United States v. Rosen,* 582 F.2d 1032, 1033 (5th Cir. 1978), *citing United States v. Bartee,* 479 F.2d 484 (10th Cir. 1973). At trial defendant stipulated that he knowingly prescribed controlled substances; only the third element above is at issue.

In attacking the sufficiency of the evidence against him, defendant contends that the expert testimony offered against him was admitted without proper foundation, and that aside from this testimony the government's case against him was insuffi-

cient. The testimony in question was given by Dr. Harold S. Cole, a physician practicing in Salt Lake City who specialized in gastroenterology and was chairman of the Ethics Committee of the Salt Lake County Medical Society. The government first attempted to qualify Dr. Cole as an expert based solely on his position on the Ethics Committee and the fact that he was a practicing physician, but defense objections of insufficient foundation were sustained. The government then elicited from Dr. Cole that he had himself prescribed Ritalin and Preludin, had read about the drugs in professional publications and in the detailed package inserts that describe the situations for which the drugs are medically indicated or contraindicated, but the trial court again sustained an objection as to lack of foundation. Dr. Cole then explained in detail the reading that he had done regarding Ritalin and Preludin, and elaborated on his own experience in prescribing Ritalin to two patients. At this point the trial court ruled that Dr. Cole was qualified as an expert, and permitted him to give his professional opinion that there was no medical indication for prescribing Ritalin to agents Lubow, Openshaw or Sauer, nor for prescribing Preludin to agent Cooper. Dr. Cole testified regarding the dangers inherent in prescribing Ritalin and Preludin, and stated that before prescribing Preludin a physician should listen to a patient's heart, measure pulse rate, examine the veins of the neck, check for swollen ankles, listen to the lungs, take a blood pressure measurement, and feel the thyroid gland in the neck.

The admission of expert testimony is within the discretion of the trial court and will be overturned on appeal only when a clear abuse of discretion has occurred. *United States v. Samara,* 643 F.2d 701, 705 (10th Cir. 1981); *United States v. Hudler,* 605 F.2d 488, 491 (10th Cir. 1979). At trial, the Court was very careful to make sure that the prosecution's expert was qualified to give an opinion. Dr. Cole testified that he had reviewed the pharmaceutical literature regarding Ritalin and Preludin and had prescribed it himself. Although the government might have been able to present a physician who had more personal experience with these two controlled substances, Dr. Cole was qualified to state his opinions, and the trial court did not abuse its discretion by admitting them.

Defendant also contends that the evidence against him was insufficient when compared to the conduct of defendant doctors in two cases decided by this Court. In *United States v. Smurthwaite, supra,* the defendant doctor was convicted on 11 counts of illegally dispensing and distributing controlled substances in violation of 21 U.S.C. § 841(a)(1). In that case the evidence consisted of:

> ... direct testimony that the defendant stated that he knew the purchasers intended to use the pills at parties; that fees were charged in accordance with the number of prescriptions, rather than on an office call basis; that the prescriptions were given for absent purported wives under circumstances where there was no discussion of the wife's need but only of the fact that the purported husband had not completed his 30-day wait since the last prescription, the time lapse necessary to have one issued in his name. Here no medical history or examination was taken, except an estimated weight was put on a card by the doctor without even asking the individual.

590 F.2d at 892. The defendant also cites our decision in *United States v. Bartee, supra,* where the defendant doctor was convicted after it was shown that he prescribed controlled substances without physical examination; that he knew two government witnesses to whom he prescribed drugs were prone to trade them; that he prescribed unusually large quantities of controlled substances to the same person in three separate prescriptions with different dates; that another undercover agent used the slang term "reds" when speaking with the defendant doctor; that the defendant charged a flat fee for each prescription; and that the defendant doctor instructed the undercover agent how to fill the prescriptions at different drugstores in order to avoid the suspicion of federal agents. 479 F.2d at 489.

There are numerous other recently reported cases where the acts of doctors convicted of improperly prescribing controlled substances seem more egregious than those of Dr. Varma.[2] However, the evidence against Dr. Varma, when viewed in a light most favorable to the prosecution, was sufficient for the jury's consideration. There was evidence that the medical histories taken by the defendant's medical staff were incomplete and that he did not attempt to complete them before prescribing. Furthermore, the physical examination performed by Dr. Varma on each of the undercover agents was patently too short and inadequate. Perhaps the most damaging evidence against defendant's case was the testimony of Dr. Varma's former receptionist. She stated that in April, 1981, Dr. Varma told his staff that he was troubled by his suspicion that some patients were taking advantage of him by requesting prescriptions for controlled substances for nonmedical reasons. At his staff's suggestion, he put up a sign in his lobby stating that he would no longer prescribe barbituates, Quaaludes or Demerol, although he stated the patients probably would not return. During the few days that the sign was posted defendant's case load dropped from 80 patients per day to 20 per day. Defendant then removed the sign, whereupon his patient load increased to at least its former level.

Although the jury might have concluded that the defendant doctor had only made a few bad judgments when prescribing drugs, they instead unanimously decided that he knowingly and intentionally prescribed controlled substances for nonmedical reasons. The testimony of the receptionist regarding the reduction in patients when the sign was up, which was uncontroverted, was strong evidence that the defendant's medical practice was largely a prescription writing business. Although the record in this case does not indicate that the defendant was as nonchalant about controlled substances as the defendant doctors in *United States v. Smurthwaite,* and *United States v. Bartee, supra,* there was ample evidence to support the jury verdict.

The convictions are affirmed.

---

**2.** *E.g., United States v. Guerrero,* 650 F.2d 728 (5th Cir. 1981) (patient told doctor prescriptions used for nonmedical purposes; doctor prescribed Quaaludes for patient's girlfriend; and doctor made false patient files to mask prescriptions to another patient); *United States v. Jackson,* 576 F.2d 46 (5th Cir. 1978) (defendant doctor prescribed methaqualone to approximately 5,000 persons within 4 month period to persons admitting on doctor's questionnaire they used drugs to "get high" or "escape from reality"); *United States v. Roya,* 574 F.2d 386 (7th Cir. 1978) (defendant doctor prescribed controlled substances without taking any medical history or performing any physical examination); *United States v. Kirk,* 584 F.2d 773 (6th Cir. 1978) (defendant doctor required patients to use false names and addresses for recordkeeping purposes; defendant destroyed patient records on request for a fee); *United States v. Boettjer,* 569 F.2d 1078 (9th Cir. 1978) (defendant doctor prescribed controlled substances to patients without any medical complaint and who stated they "liked them," "out of them," after only a casual physical exam); *United States v. Rosen,* 582 F.2d 1032 (5th Cir. 1978) (defendant prescribed controlled substances to undercover agents solely for checking his office for microphone "bugs" and telephone tap); and *United States v. Fellman,* 549 F.2d 181 (10th Cir. 1977) (defendant doctor prescribed controlled substances without taking medical history or making physical examination).