**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 6 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

FRANK HERBERT WONSCHIK, JR.,

Defendant-Appellant.

No. 02-1276

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 01-CR-410)**

---

Jill M. Wichlens, Assistant Federal Public Defender, (Michael G. Katz, Federal Public Defender, with her on the brief) Denver, Colorado for Defendant-Appellant.

Robert M. Russel, Assistant United States Attorney, (John W. Suthers, United States Attorney, with him on the brief), Denver, Colorado for Plaintiff-Appellee.

---

Before **MURPHY** , **BRORBY** , and **McCONNELL** , Circuit Judges.

---

**McCONNELL** , Circuit Judge.

In this appeal, we consider (1) whether a jury instruction that defined

"machinegun" as that term is defined in § 5845(b) of the National Firearms Act

(26 U.S.C. § 5845(b)) constructively amended a defendant's indictment for possessing "parts from which a machine gun could be assembled," and (2) whether a district judge's leading jurors in reciting the Pledge of Allegiance during voir dire violated a defendant's right to a fair trial. We answer both questions in the negative and, therefore, **AFFIRM** the judgment of the district court.

## I.

On the evening of November 19, 1999, Appellant Frank Herbert Wonschik, Jr. was home alone at his house in a suburban neighborhood in Aurora, Colorado. That night became memorable for Mr. Wonschik's neighbors when they heard gunshots coming from inside Mr. Wonschik's house and noticed bullets passing through the walls of their own house. The neighbors immediately summoned the police, who arrived outside Mr. Wonschik's house at about 7:00 p.m.

Mr. Wonschik staggered down his driveway to meet the police. He was obviously drunk. He held up a large, M-80 style firecracker and a lighter and asked the police, "Did you hear that loud bang?" Tr. 208. The officers, for safety reasons, placed Mr. Wonschik in the back of a patrol car. Although the officers asked him no questions, Mr. Wonschik began a bizarre soliloquy. He stated that he had received death threats, that Colombian drug lords were watching him, that one of his neighbors was out to get him, that he was a millionaire who spent

$500,000 a year on lawyers, and that he had no idea how the holes in his wall got there.

The police promptly obtained a search warrant and entered Mr. Wonschik's house. On the wall in the main room downstairs, the police observed a poster of a wolf with bullet holes in it and several spent 10-millimeter casings nearby. It was evident that Mr. Wonschik, in his inebriated condition, had fired several rounds from a 10-millimeter pistol into the wolf and that those rounds had passed through Mr. Wonschik's walls and prompted the neighbors to call the police.

The officers also discovered, on a table in the same room, a partially disassembled Colt AR-15 rifle, which is the civilian, semiautomatic version of the military's M-16 automatic rifle. [1] The police also found many boxes of 5.56 millimeter ammunition for the AR-15, as well as a coffee can full of spent 5.56 casings. The officers then searched a bedroom upstairs, where they found, in a filing cabinet, a bag containing several small gun parts. The police determined that the parts were apparently the components necessary to convert a semiautomatic AR-15 into a fully automatic M-16, including an M-16 bolt carrier, M-16 hammers, an M-16A2 trigger, M-16 disconnectors, disconnector springs, a selector switch, a three-shot burst cam, and two drop-in auto sears. Finally, the

---

[1] The Colt AR-15 is also known as the Colt Model SP-1, which is how Mr. Wonschik's rifle is designated in the indictment. The indictment describes the weapon as ".223 caliber," which is equivalent to 5.56 millimeter. R. doc. 1.

police discovered, in a different bedroom, an instruction manual that explained how to convert a semiautomatic AR-15 into a fully automatic weapon. The manual warned that it was illegal to possess M-16 parts.

Mr. Wonschik was eventually indicted by a federal grand jury on one count of illegal possession of a machine gun in violation of 18 U.S.C. § 922(o). The grand jury specifically charged Mr. Wonschik with possessing "a combination of parts . . . from which a machine gun could be assembled." R. doc. 1. At trial, a government expert witness testified that he installed some of the M-16 parts found in the filing cabinet into Mr. Wonschik's AR-15. The expert explained that he was unable to make the weapon function with either of the drop-in auto sears installed, so he tested the modified AR-15 without an auto sear. [2] He told the jury that he twice loaded the modified weapon with two rounds and that both times the weapon fired automatically, meaning that both rounds fired with one pull of the trigger. On cross-examination, the government expert stated that he did not know

[2]In an M-16, the "auto sear" facilitates proper timing of automatic firing by catching the hammer when the bolt carrier forces it back after firing and then releasing the hammer after the bolt carrier has moved forward in preparation for the next cycle. Tr. 357. A "drop-in" auto sear replicates the function of an M-16 sear in an AR-15 that has been converted into an automatic weapon by the addition of M-16 fire control parts. Tr. 309. An auto sear can, by itself, constitute a "machinegun" under the National Firearms Act. *United States v. Cash*, 149 F.3d 706, 706-08 (7th Cir. 1998).

whether the modified AR-15 would successfully fire automatically until he tested it.

Mr. Wonschik's defense was that his weapon, as assembled by the government expert, was not "automatic," and therefore not a machine gun, and that the government could not prove that he knew that his combination of parts could be assembled into a functioning machine gun. In support of this theory, Mr. Wonschik put his own expert witness on the stand. The defense expert testified that Mr. Wonschik's AR-15, as modified by the government expert, did not qualify as an automatic weapon. Because the modified weapon did not contain an auto sear, which the defense expert characterized as "an integral part of the fire control system," Tr. 380, the government expert was only able to get Mr. Wonschik's rifle to fire automatically by inducing a malfunction. Mr. Wonschik's expert also testified that he would not know whether a weapon modified in this way would actually fire automatically without testing it.

Defense counsel moved for a judgment of acquittal on the ground that the government had provided insufficient evidence that he knew that his parts could be assembled into a machine gun. The district court denied the motion and submitted the case to the jury. The jury was instructed that the government must prove that the defendant knew that the relevant parts constituted "a combination of parts from which a machine gun can be assembled." R. doc. 42, Instruction 12.

The instructions defined "machine gun" to include "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically." *Id*. The jury convicted Mr. Wonschik of the one-count indictment. The district judge subsequently sentenced Mr. Wonschik to 27 months' imprisonment.

The morning before Mr. Wonschik's trial began, the parties and the district judge gathered in the courtroom before a panel of 47 potential jurors in order to conduct voir dire. The judge introduced himself to the panel, and then began speaking to the panel about the events of September 11 and the obligations of American citizens. He referred to a young family friend in the Marines who was deployed to the Middle East, and then said:

> This kid is off to fight a war for us. The least we can do is to uphold what he holds sacred. He pledged an oath to support and defend the United States against all its enemies; and he expect us, you and me, to uphold the Constitution of the United States. And that's what we're going to do in this room today. And you people, citizens of the United States, are going to bring life to the Constitution. The Constitution is nothing but a shriveled piece of paper unless people like you breathe life into it.
>
> I didn't do it before September 11, the Pledge of Allegiance, in the morning we begin a trial. It isn't that I didn't put stock in it. Of course, I did. But I just didn't think it needed to intrude on the business of the Court every time we pick a jury trial. I was wrong. Each of us, me included, on an occasion of this importance, needs to remind ourselves of our obligation to our country.
>
> Would you join me now in the Pledge of Allegiance.

Tr. 16. The judge and jurors then apparently recited the Pledge of Allegiance as it is codified in 4 U.S.C. § 4: "I pledge allegiance to the Flag of the United States

-6-

of America, and to the Republic for which it stands, one Nation under God, indivisible, with liberty and justice for all."

On appeal, Mr. Wonschik contends that his conviction must be overturned because (1) the jury instructions effectively amended the indictment; and (2) the trial judge's leading the Pledge of Allegiance during voir dire deprived him of a fair trial.

## II.

The jury convicted Mr. Wonschik of a violation of 18 U.S.C. § 922(o), which makes it unlawful "for any person to transfer or possess a machinegun." The related definition section refers to the definition of "machinegun" provided in § 5845(b) of the National Firearms Act. 18 U.S.C. § 921(a)(23). The National Firearms Act in turn provides the following definition:

> (b) Machinegun. The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b).

The indictment closely follows this statutory language. The grand jury alleged that Mr. Wonschik

did unlawfully and knowingly possess a machine gun, to wit: a combination of parts, in the possession and control of FRANK HERBERT WONSCHIK, Jr., namely: a Colt, Model SP1, .223 caliber, semi-automatic rifle, an M16 selector, an M16 bolt carrier, M16 hammers, M16A2 trigger, M16 disconnectors, disconnector springs, and a three shot burst cam, from which a machine gun could be assembled . . . .

R. doc. 1.

Finally, Jury Instruction 12, which Mr. Wonschik claims impermissibly broadened the indictment, also tracks the statutory language:

In order to convict the defendant . . ., the government must prove each of the following elements beyond a reasonable doubt:
*First:* That the defendant knowingly possessed a machine gun; and
*Second:* That the defendant knew that the Colt, Model SP1, .223 caliber, semi automatic rifle; and M16 bolt carrier, M16 hammers, M16A2 trigger, M16 disconnectors, disconnectors [sic] springs, and a three shot burst cam, was a combination of parts from which a machine gun can be assembled.
As used in this instruction, the term "machine gun" includes any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot without manual reloading, by a single function of the trigger. The term "machine gun" also includes any combination of parts from which a machine gun can be assembled if such parts are in the possession or under the control of a person.

R. doc. 42.

Mr. Wonschik and the government both agree that the statute prohibits possession of a "combination of parts from which a machinegun can be assembled" and that the indictment charged Mr. Wonschik with possession of such parts. The dispute is over how to define the term "machinegun" as it refers

-8-

to the result of assembling the parts. Specifically, Mr. Wonschik contends that "machinegun" here means a gun actually capable of firing automatically. His position is therefore that, under the indictment, the government was required to prove that he knowingly possessed a combination of parts from which a functioning automatic weapon could be assembled. Instruction 12, however, defined "machinegun" more broadly to include weapons "designed to shoot" automatically, as well as weapons that actually shoot automatically. Thus, according to the instruction, the jury did not have to find that Mr. Wonschik's parts could be assembled into a functioning automatic weapon, because the instruction allowed conviction on the basis that his parts could be assembled into a weapon that was merely "designed" to shoot automatically.

The government apparently agrees that the instruction allowed conviction on that basis. However, according to the government, the instruction did not impermissibly broaden the indictment because the instruction's interpretation of "machinegun" to include weapons designed to shoot automatically is perfectly consistent with how "machinegun" is defined in § 5845(b). Because the indictment tracks that same statutory language, it is reasonable, in the government's view, to interpret the term "machinegun" in the indictment as referring to weapons designed to shoot automatically, as well as to actually functioning automatic weapons.

-9-

Mr. Wonschik's trial counsel did not object to Instruction 12. We therefore review his constructive amendment claim for plain error. *United States v. Cavely*, 318 F.3d 987, 999 (10th Cir. 2003).[3] When trial counsel fails to object, the appellate court will liberally construe the indictment in favor of validity. *United States v. Phillips*, 869 F.2d 1361, 1364-65 (10th Cir. 1988). We will only find that a constructive amendment occurred when "the evidence presented at trial, together with the jury instructions, raises the possibility that the defendant was convicted of an offense other than that charged in the indictment." *United States v. Apodaca*, 843 F.2d 421, 428 (10th Cir. 1988) (citing *Stirone v. United States*, 361 U.S. 212, 215-19 (1960)).

We are not persuaded that Mr. Wonschik's interpretation of § 5845(b) and the corresponding language in the indictment is correct. One serious problem with Mr. Wonschik's reading is that it would result in giving the term "machinegun" two separate meanings within the same subsection of the National Firearms Act. Mr. Wonschik contends that the term "machinegun" in the phrase

---

[3]There is some uncertainty in our precedents as to whether a constructive amendment of an indictment by jury instructions to which the defendant did not object is reversible per se or reversible only where the amendment "affects substantial rights" and "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Compare United States v. Levine*, 41 F.3d 607, 617 n.13 (10th Cir. 1994) *with Cavely*, 318 F.3d at 999. Because we conclude that no constructive amendment occurred here, we need not resolve this question.

"parts from which a machinegun can be assembled" should mean something like "a weapon that actually fires automatically," even though the first sentence of the same subsection expressly states that "the term 'machinegun' means any weapon which shoots, *is designed to shoot, or can be readily restored to shoot*, automatically." 26 U.S.C. § 5845(b) (emphasis added). Where, as here, a statute begins with a sentence stating what a term "means," and then repeats that term later in the same subsection, it seems reasonable to give the later-appearing term the same meaning that it was given in the first sentence. *Cf. Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 479 (1992) (referring to the basic canon of statutory construction that a term or phrase should generally be given the same meaning each time it appears in the same act). Mr. Wonschik has provided no authority supporting his claim that "machinegun" should mean less at the end of the paragraph than it does at the beginning.

There does appear to be a confusing circularity to the treatment of "machinegun" in § 5845(b). The statute offers a definition of machinegun as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically," and then goes on to state that "the term shall also include" the frame or receiver of a machinegun, parts designed and intended to convert a weapon into a machinegun, and parts from which a machinegun can be assembled. Thus, the statute seems circularly to say that a "machinegun" is, among other

-11-

things, a "receiver of a machinegun" or "parts that can be made into a machinegun." However, any resulting confusion can be resolved through close attention to the subsection's grammatical structure. Subsection (b), as noted above, provides a primary definition of the term "machinegun" and then sets apart this primary definition with a period. A new sentence then states that the "term shall also include" receivers or parts bearing some relation to a "machinegun." This structure suggests that, where "machinegun" or "such weapon" appears in the second part of the subsection, as an attribute of receivers or parts, the statute implicitly substitutes in the primary definition of "machinegun" provided in the first sentence. This reading provides a consistent definition for "machinegun" and "such weapon" (namely, "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger") each time these terms appear within the subsection. Thus, the phrase "a combination of parts from which a machinegun can be assembled" actually means "a combination of parts from which [any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger] can be assembled." This is precisely the definition set forth in Instruction 12. It follows that the instruction did not amend

-12-

the indictment, but instead correctly tracked the statutory definition on which the indictment was based.

III.

Although Mr. Wonschik's trial counsel did not object to the jurors' recitation of the Pledge of Allegiance, he now contends on appeal that the district judge violated the Constitution. Mr. Wonschik argues that the district judge's action was unconstitutional under *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943), in which the Supreme Court held that a state board of education could not compel its students to recite the Pledge of Allegiance. However, the question whether recitation of the pledge in this context violates *Barnette* is irrelevant, because Mr. Wonschik does not claim that *he* was compelled or invited to recite the pledge, and he does not have third-party standing to raise claims on behalf of the potential jurors. *See Terrell v. INS*, 157 F.3d 806, 809 (10th Cir. 1998).

Mr. Wonschik's more serious argument is that jurors' recitation of the pledge, in a case where the United States is a party, violates the other party's right to a fair trial because the jury is in effect pledging its allegiance to one party in the case. Mr. Wonschik contends that the jury was particularly likely to draw this inference in his case because immediately following recitation of the pledge,

the district judge addressed the prosecutor and asked whether "the United States of America" was ready to proceed.  Tr. 16.

We recognize that trial judges, among their many other responsibilities, should take care not to create the impression that it is appropriate for the judge or the jury to favor the prosecution simply because the court and the prosecution are both institutions of the United States.  However, we do not think it reasonable to suppose that the jurors inferred from the Pledge of Allegiance a patriotic obligation to serve as a rubber stamp for the prosecution.  Rather, we believe the pledge represents, and evoked in the jurors' minds, a more enlightened patriotism, fidelity to which required them to uphold our nation's Constitution and laws by sitting as impartial finders of fact in the matter before them.  That is as likely to benefit a defendant as to prejudice him.

IV.

For the foregoing reasons, the judgment of the district court is **AFFIRMED** .  All pending motions are denied.