**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 30, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

<u>PUBLISH</u>

### UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

DANTE ROVON PEPPERS,

    Defendant - Appellant. .

Nos. 23-3112 & 23-3113

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. Nos. 5:20-CR-40087-TC-2, 5:15-CR-40068-TC-1)**

_____

Paige A. Nichols, Assistant Federal Public Defender (Melody Brannon, Federal Public Defender, with her on the briefs), Kansas Federal Public Defender, Topeka, Kansas, for Defendant-Appellant Dante Peppers.

Bryan C. Clark, Assistant United States Attorney (Kate E. Brubacher, United States Attorney, and James A. Brown, Assistant United States Attorney, with him on the brief), Kansas City, Kansas, for Plaintiff-Appellee United States of America.

_____

Before **TYMKOVICH**, **EBEL**, and **EID**, Circuit Judges.

_____

**EBEL**, Circuit Judge.

_____

In these consolidated direct criminal appeals, Defendant Dante Peppers challenges 1) his two 2023 convictions, following a jury trial, for conspiring to possess methamphetamine with the intent to distribute it and for using a

communications facility to facilitate the conspiracy and 2) the revocation of his supervised release for a 2016 felon-in-possession conviction based on his 2023 drug-trafficking convictions.  Having jurisdiction under 28 U.S.C. § 1291, we AFFIRM.  In upholding Peppers' 2023 convictions, we conclude that the superseding indictment's conspiracy count was not constructively amended at trial and the district court did not abuse its discretion in excluding a defense investigator's hearsay testimony as to statements made by a non-testifying co-conspirator.  We further conclude that the district court had jurisdiction to revoke Peppers' supervised release for his 2016 conviction, based upon his 2023 drug-trafficking convictions, even though the supervised release term expired prior to the conclusion of the 2023 drug-trafficking prosecution.

## I. APPEAL NO. 23-3112

In appeal No. 23-3112, Peppers challenges his 2023 convictions, following a jury trial, for 1) conspiring to possess, with the intent to distribute, and distributing methamphetamine; and 2) using a communication facility to facilitate that conspiracy.

## A. Factual background

Viewed in the light most favorable to the jury's verdict, see United States v. Chapman, 839 F.3d 1232, 1235 (10th Cir. 2016), the evidence at Peppers' trial indicated the following:  Peppers drew police attention while officers were investigating Tyrone Millsap, in 2019 and 2020, for distributing methamphetamine in Junction City, Manhattan, and Topeka, Kansas.  On July 6, 2020, Peppers and

Millsap, using Facebook Messenger, discussed the possibility of Peppers selling Millsap methamphetamine.  At that time, Millsap had customers wanting methamphetamine, but he had no supply and no money to buy the drug.  Peppers, on the other hand, indicated he had methamphetamine to sell, but he did not want to "front" Millsap the drugs.

Over the next several weeks, police documented three times when Millsap arranged to sell methamphetamine to a government informant. Peppers was involved in at least one of those sales.

**July 13, 2020, sale.**  Millsap arranged to meet the informant on July 13, 2020, in an apartment complex parking lot in Topeka to sell the informant an ounce of methamphetamine for $800.  When the informant got to that location, Millsap got into the informant's car and called an unknown person, telling that person that the informant had arrived.  The unknown person responded something to the effect that "he [wa]s on his way."  (5 R. 103.)  A few minutes later, a black Chevrolet Impala drove into the parking lot.  Millsap briefly went over to the Impala, then returned to the informant's car, where Millsap sold the informant methamphetamine.  Millsap shorted the informant, selling him less than half an ounce of methamphetamine, instead of an ounce.

An officer surveilling this sale reported that the Impala driver was a black male with a bald or buzzed head, about 5'10" tall and weighing approximately 260 pounds.  That description did not match Peppers, who is 5'7" tall and weighed 180 pounds.  There was also a white female passenger in the Impala.  The Impala was

3

registered to William Tunstall, a black police officer in Independence, Kansas, and Lindsey Frye, a white woman. Police found no evidence that Tunstall was involved in any unlawful activity. Frye was Peppers' girlfriend.

**July 27, 2020, sale.** Millsap arranged to meet the informant again at the same apartment complex parking lot on July 27, 2020. This time, Millsap agreed to sell the informant one and one-half ounces of methamphetamine for $800 in order to make up for shorting the informant during the first sale. When the informant arrived at the buy location, Millsap again got into the informant's vehicle, used the informant's cell phone to call (**-9244), and told an unknown man that the informant was there. The unknown man responded that someone was coming to meet Millsap. Soon thereafter, the same black Chevy Impala entered the parking lot. Millsap got into the back seat of the Impala for a short time, then returned to the informant's car, where Millsap sold the informant methamphetamine. Millsap again shorted the informant, exchanging half an ounce of methamphetamine and an ounce of a "non-controlled substance" that was not methamphetamine for $800. (Id. at 129.)

This time, police followed the Impala after it left the parking lot and eventually conducted a traffic stop. During the stop, police discovered that Peppers was driving and Frye was a passenger. No arrest occurred during this stop.

**August 20, 2020, sale.** Millsap arranged to meet the informant on August 20, 2020, at the same parking lot to sell the informant two ounces of methamphetamine for $1,400. But Millsap failed to appear. An hour later, a woman using Millsap's Facebook Messenger account contacted the informant and changed the location for

4

the sale to a nearby convenience store/gas station.  At the convenience store, a white woman, Lori Hause, and a black man, Frank Robinson, waited for the informant in a black Lincoln that had previously been linked to Millsap.  Robinson weighed 260 pounds, generally fitting the description of the Impala driver from the first controlled buy.  An hour prior to this exchange, Hause had tried to call the same phone number that Millsap had called prior to the second drug deal, (**-9244), but that call went unanswered.

When the informant arrived at the convenience store, Hause walked over to his car and sold him methamphetamine.  Instead of the agreed-upon two ounces, however, Hause delivered less than one ounce.

## B. Procedural background

In November 2020, a federal grand jury indicted Peppers on one count charging him with conspiring with Millsap both to possess methamphetamine with the intent to distribute it and to distribute methamphetamine.  A year later, a federal grand jury returned a superseding indictment charging Peppers, Millsap, and Hause with conspiring, from July 6 to August 20, 2020, to possess methamphetamine with the intent to distribute it, and to distribute methamphetamine.  In addition to that conspiracy count (Count 1), the superseding indictment charged Peppers in Count 2 with using a communications facility on July 6, 2020, to facilitate a felony controlled substance offense (the conspiracy charged in Count 1); and in Counts 3 and 4 with

5

distributing methamphetamine, on July 13 and July 27, 2020, respectively.[1]  The

superseding indictment also charged Hause with several other drug-trafficking

offenses.  Peppers' two co-defendants, Millsap and Hause, entered guilty pleas.

Peppers elected to go to trial.

At trial, the Government asserted that Peppers was supplying Millsap with the

methamphetamine he was selling.  The defense argued that the Facebook messaging

between Peppers and Millsap on July 6, 2020, never resulted in any agreement

between the two.  The defense further argued that it was Millsap's modus operandi to

short his customers, even before this charged time period; Millsap called for the

Impala before the July 13 and July 27 controlled buys charged in this case simply to

make it look like it was his supplier, instead of Millsap, who was responsible for

shorting the informant; and, in fact, Millsap had the methamphetamine he sold the

informant on those dates with him the entire time.

The jury convicted Peppers of two charges, 1) conspiring, from July 6 through

August 20, 2020, to possess methamphetamine with the intent to distribute it and to

distribute it; and 2) using a communications facility on July 6, 2020, to facilitate that

conspiracy.  The jury acquitted Peppers of the other two counts charging him with

distributing methamphetamine on July 13 and July 27, 2020.  The district court

---

[1] The superseding indictment also charged Peppers, in Count 5, with using a
communications facility on July 27, 2020, to facilitate the distribution charged in
Count 4.  The Government dismissed Count 5 prior to trial.

sentenced Peppers to sixty months in prison on Count 1 and forty-eight months in prison on Count 2, to run concurrently, followed by three years of supervised release.

## C. Discussion

Peppers challenges both of his drug-trafficking convictions, asserting the following two grounds for relief: 1) the jury instructions and the prosecutor's opening statement at trial constructively amended the conspiracy charged in Count 1, in violation of Peppers' Fifth and Sixth Amendment rights; and 2) the district court abused its discretion in refusing to allow a defense investigator to testify as to statements a non-testifying co-conspirator, Millsap, made to her.  Because neither argument is persuasive, we affirm Peppers' two 2023 drug-trafficking convictions.

### 1. The district court did not plainly err because there was no constructive amendment

A criminal defendant has a "Fifth Amendment right to be indicted by a grand jury on the charges against him and [a] Sixth Amendment right to receive notice of those charges."  United States v. Miller, 891 F.3d 1220, 1237 (10th Cir. 2018).  "Thus, 'it is a fundamental precept of the federal constitutional law that a "court cannot permit a defendant to be tried on charges that are not made in the indictment.""  Id. (quoting Hunter v. New Mexico, 916 F.2d 595, 598 (10th Cir. 1990) (per curiam) (quoting Stirone v. United States, 361 U.S. 212, 217 1960))).  That constitutional precept is violated by a constructive amendment, see id., which "occurs when there's a 'possibility that the defendant was convicted of an offense other than that charged in the indictment,'" United States v. Ray, 899 F.3d 852, 865 (10th Cir. 2018) (quoting United

7

States v. Apodaca, 843 F.2d 421, 428 (10th Cir. 1988)).  Peppers contends that, in his case, the superseding indictment's Count 1 was constructively amended at trial.[2]

### a. We review for plain error

Because Peppers did not argue a constructive amendment in the district court, we review for plain error.  See Fed. R. Crim. P. 52(b); see also Miller, 891 F.3d at 1231.  To succeed on his claim, then, Peppers

> must "demonstrate: (1) an error, (2) that is plain, which means clear or obvious under current law, and (3) that affects substantial rights. If he satisfies these criteria, this Court may exercise discretion to correct the error if (4) it seriously affects the fairness, integrity, or public reputation of judicial proceedings."

United States v. Moore, 96 F.4th 1290, 1299–300 (10th Cir. 2024) (quoting United States v. Rosales-Miranda, 755 F.3d 1253, 1258 (10th Cir. 2014)).  "[W]e apply this rule less rigidly when reviewing a potential constitutional error."  Miller, 891 F.3d at 1231 (quoting United States v. James, 257 F.3d 1173, 1182 (10th Cir. 2001)).  "Even under plain error review, we will 'find that a constructive amendment occurred when the evidence presented at trial, together with the jury instructions, raises the possibility that the defendant was convicted of an offense other than that charged in the indictment."  Id. (quoting United States v. Wonschik, 353 F.3d 1192, 1197 (10th Cir. 2004) (emphasis added in Miller)).

---

[2] Peppers further contends that the constructive amendment of Count 1 also requires this court to vacate his conviction on Count 2 which charged him with using a communication facility to facilitate the drug-trafficking conspiracy charged in Count 1.  Our ruling as to Count 1 also resolves Peppers' challenge to Count 2.

### b. There was no constructive amendment

Peppers' argument fails at the first step in plain-error review because there was no constructive amendment.

> In assessing a claim of an impermissible constructive amendment, our ultimate inquiry is whether the crime for which the defendant was convicted at trial was charged in the indictment; to decide that question, we therefore compare the indictment with the district court proceedings to discern if those proceedings broadened the possible bases for conviction beyond those found in the operative charging document.

Id. at 1231–32 (quoting United States v. Farr, 536 F.3d 1174, 1180 (10th Cir. 2008)).

Here, the operative charging document, the superseding indictment, charged Peppers, in Count 1, with conspiring with Millsap and Hause, from on or about July 6, 2020, through on or about August 20, 2020, "to possess with the intent to distribute and distribute mixtures and substances containing a detectable quantity of methamphetamine."[3]  (1 R. 20–21.[4])  In order to convict Peppers of that charged conspiracy, the Government had to prove that he conspired with either Millsap or Hause. See Davis, 995 F.3d at 1167; see also United States v. Spencer, 592 F.3d 866, 873 (8th

---

[3] Often the Government will charge conspiracy with certain named co-conspirators "and others, known and unknown to the grand jury," or "and others, named and unnamed," or just "and others."  See, e.g., United States v. Davis, 995 F.3d 1161, 1167–68 (10th Cir. 2021).  In fact, the original indictment in this case charged Peppers and Millsap with conspiring "with each other, and with other persons known and unknown to the Grand Jury."  (1 R. 17–18.)  But the operative charging document in this case, the superseding indictment, charged Peppers in Count 1 with conspiring only with a specified and closed group—his co-defendants, Millsap and Hause.

[4]  The superseding indictment alternatively charged Peppers (and Millsap and Hause) with aiding and abetting the charged conspiracy.  See 18 U.S.C. § 2.

Cir. 2010) ("A defendant can be convicted of conspiracy even if the jury concludes that not everyone alleged to be involved in the conspiracy actually participated."). The evidence would also be sufficient to convict Peppers of the conspiracy charged in Count 1 even if there was proof of additional uncharged co-conspirators, so long as there was evidence that some of those named in the indictment were members of the conspiracy. See United States v. Shavers, 955 F.3d 685, 691 (8th Cir. 2020) (where the indictment's count one "charged that Shavers conspired with Roberts, and not any other person, the Government needed to prove a conspiracy between those two. So long as it found beyond a reasonable doubt that Shavers and Roberts were both participants in the conspiracy, a jury could convict Shavers of count one even if there was evidence suggesting that there were also other participants in that conspiracy.").

To assess whether there was a constructive amendment in this case, we compare the conspiracy charged in Count 1 "with the district court proceedings to discern if those proceedings broadened the possible bases for conviction beyond those found in the operative charging document." Miller, 891 F.3d at 1231–32 (quoting Farr, 536 F.3d at 1180). The problem here, as Peppers points out, is that the jury instruction on conspiracy, viewed in isolation, might have permitted the broadening of the charged conspiracy. See United States v. Morton, 412 F.3d 901, 905–06 (8th Cir. 2005); United States v. Keller, 916 F.2d 628, 634–36 (11th Cir. 1990). Whereas the superseding indictment charged a conspiracy between only Peppers, Millsap and/or Hause, the jury instructions permitted the jury to convict Peppers of conspiracy upon

10

proof more generally that "two or more persons agreed to violate the federal drug laws."[5]  (1 R. 226.)

Peppers also points to the prosecutor's opening statement at trial, when he told jurors, somewhat confusingly, that

> Count 1[] is a conspiracy to distribute methamphetamine as well as possess with the intent to distribute methamphetamine, and the [G]overnment alleges that this occurred between July 6th of 2020 to on or about August 20th of 2020, and it involves persons both known and unknown to the [G]overnment, namely the defendant, Dante Peppers, as well as an individual by the name of Tyrone Millsap and another individual by the name of Laurie Hause.

(5 R. 43 (emphasis added).)  The prosecutor further stated, more generally, that "there are four persons that the Government believes are engaged in criminal conduct in this case that you will hear about.  You may hear about others, but there are four main persons of focus": 1) Millsap, 2) Peppers, 3) Hause, and 4) an unidentified person using phone number (**-9244).  (5 R. 44.)

---

[5] We reject the Government's assertion that Peppers cannot rely on this instruction to establish a constructive amendment because he requested this instruction.  The record indicates that, prior to trial, it was the Government who proposed the three-page conspiracy instruction, which was a modified version of Tenth Circuit Criminal Pattern Jury Instruction 2.87 (2021).  Peppers neither proposed a conspiracy instruction of his own nor objected to the government's proposed conspiracy instruction.  At trial, Peppers did ask the court to add a paragraph to the proposed conspiracy instruction indicating that evidence of the defendant's mere presence at an incident or association with certain people is not enough to convict him of conspiracy.  After the district court added that requested language, defense counsel indicated he had no objection to the conspiracy instruction.  Peppers, thus, did not invite the problem we address here—including language in the instruction allowing the jury to convict Peppers of the charged conspiracy if any two persons agreed to violate the federal drug law—but instead he simply failed to object to that problem. See United States v. Brown, 400 F.3d 1242, 1251–53 & 1253 n.5 (10th Cir. 2005).

Notwithstanding the jury instruction and Government's opening statement, however, we conclude that the trial proceedings in this case did not impermissibly broaden the conspiracy charged in Count 1 between Peppers, Millsap, and/or Hause because, in light of the evidence presented at trial, a reasonable jury could only have convicted Peppers of conspiring with Millsap and possibly Hause. See United States v. Abbey, No. 97-1284, 1998 WL 321204, at *10–12 (10th Cir. June 5, 1998) (unpublished) (holding that, where indictment alleged defendant conspired only with one named co-conspirator, but instructions allowed jurors to convict if defendant "conspired with any person," "there was no constructive amendment" because, "[a]lthough the . . . jury instructions mentioned the possibility of conspirators not listed in the indictment, there was simply no evidence of any such conspirators' involvement in the acts alleged")[6]; see also Morton, 412 F.3d at 905–06 (8th Cir.).

The trial evidence focused on the Government's months-long investigation of Millsap's methamphetamine distribution, including the three methamphetamine sales he arranged with the informant. There was evidence of Peppers' involvement with Millsap, including Peppers and Millsap messaging each other, on July 6, 2020, and Peppers' appearance at the second methamphetamine sale Millsap arranged with the informant. There was evidence that Millsap additionally involved others in his sales to the informant. But each of those other actors was connected directly to Millsap. Hause, for example, conducted the third methamphetamine sale for Millsap. There is

_____

[6] Though not binding, we find this unpublished decision's reasoning persuasive.

12

little to connect Peppers to Hause or, for that matter, to the other, peripheral actors aiding Millsap. Frye's car appeared at two of the sales, and she was found in the car with Peppers during the second methamphetamine sale to the informant. But they are at that second sale only after Millsap arranged the sale and then summoned them. The only conspiracy that a reasonable jury could have found, based on the evidence, revolved around Millsap. The jury, then, could only have convicted Peppers of the charged offense of conspiring with Millsap (and perhaps Hause), or of aiding and abetting a conspiracy between Millsap and Hause.

Bolstering that conclusion, we note that, during closing arguments, the Government, consistent with the indictment, argued that there was a conspiracy between Millsap and Peppers. See Morton, 412 F.3d at 905–06 (considering Government's arguments at trial). The Government did not urge jurors to find a conspiracy different than the one charged in the superseding indictment, between Millsap, Peppers and/or Hause. Because there was, then, no possibility that a reasonable jury could have convicted Peppers of some other, uncharged conspiracy to possess methamphetamine with the intent to distribute it, we conclude Count 1 was not constructively amended at trial.

### 2. The district court did not abuse its discretion in excluding a defense investigator's hearsay testimony as to statements Millsap made regarding Peppers' involvement in Millsap's drug sales

Peppers next challenges the district court's decision to exclude a defense investigator's testimony, offered under Fed. R. Evid. 804(b)(3), as to statements Millsap made about Peppers' involvement in Millsap's drug sales. We review that

13

challenged evidentiary ruling for an abuse of discretion.  See United States v.

Morrow, 79 F.4th 1169, 1179 (10th Cir. 2023).

### a. Background

Prior to Peppers' trial, his co-defendant Millsap pled guilty to the conspiracy

charged in the superseding indictment's Count 1 and was sentenced to sixty months'

probation.  In pleading guilty, Millsap admitted under oath that he conspired with

Peppers to distribute methamphetamine.[7]  Thereafter, in preparation for Peppers'

trial, his defense investigator called Millsap, apparently by accident, explained that

she was an investigator for the Public Defender's Office working on Peppers' case,

and asked Millsap about Peppers' role in the case.  According to the investigator,

Millsap told her:

- Millsap was trying to sell the informant fake methamphetamine.

- Millsap called Peppers and asked him to pull up during a sale "to make it look like [Millsap] was . . . meeting a 'drug dealer.'"

- Millsap already had the fake methamphetamine with him, but he wanted the informant "to think [Millsap] was getting it from someone so [the informant] wouldn't know where it came from."

- Millsap asked Peppers "to do the fake pull-up on two different occasions."

- Peppers "handed" Millsap "some weed but that was for" Millsap.

- This happened the day they all got arrested.

- When Millsap spoke with Peppers on Facebook Messenger, they were talking about weed.

---

[7] The record does not appear to include the verbatim admissions Millsap made when he pled guilty.

14

- "[A]nytime they were talking about money or anything it was just about weed."

- Peppers "just messes with weed and nothing else."

(1 R. 145–46 (investigator's report of call).)

At trial, Peppers subpoenaed Millsap to testify but Millsap refused, invoking his Fifth Amendment privilege against self-incrimination.[8] Peppers then sought to call his criminal investigator to testify, under Fed. R. Evid. 804(b)(3), as to what Millsap had told the investigator about Peppers' role in the charged offenses. The district court refused to allow Peppers' investigator to testify.

### b. Relevant law

Hearsay—"an out-of-court statement 'offer[ed] in evidence to prove the truth of the matter asserted in the statement[,]' Fed. R. Evid. 801(c)"—"is generally inadmissible as evidence because it is considered unreliable." United States v. Lozado, 776 F.3d 1119, 1121 (10th Cir. 2015) (citing Williamson v. United States, 512 U.S. 594, 598 (1994)). But Fed. R. Evid. 804(b)(3) provides an exception to the rule against hearsay:

> **(b) The exceptions.** The following are not excluded by the rule against hearsay if the declarant is unavailable as a witness:
>
>   . . . .
>
> **(3) Statement Against Interest.** A statement that:

---

[8] Millsap's lawyer explained that, ordinarily after a co-defendant pleads guilty and has been sentenced, he has waived his Fifth Amendment privilege against self-incrimination. But here, because what Millsap apparently told Peppers' investigator might be inconsistent with the statements he made to the court when entering his guilty plea, Millsap could be subject to prosecution for perjury. In light of that, Millsap declined to testify at Peppers' trial and, instead, invoked his Fifth Amendment privilege against self-incrimination.

> **(A)** <u>a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it</u> was so contrary to the declarant's proprietary or pecuniary interest or <u>had so great a tendency</u> to invalidate the declarant's claim against someone else or <u>to expose the declarant to</u> civil or <u>criminal liability</u>; <u>and</u>
>
> **(B)** <u>is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.</u>

Fed. R. Evid. 804(b)(3) (emphasis added.[9])

"This hearsay exception 'is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true.'" <u>United States v. Yellowhorse</u>, 86 F.4th 1304, 1307 (10th Cir. 2023) (quoting <u>Williamson</u>, 512 U.S. at 599). "The party seeking introduction of a self-inculpatory, out-of-court statement must establish three elements: 1. The declarant is unavailable. 2. The statement is against the declarant's penal interest. 3. Corroborating circumstances sufficiently and clearly indicate the trustworthiness of the statement." <u>Id.</u> (citing <u>Lozado</u>, 776 F.3d at 1122). "The rule's corroboration requirement reflects 'a long-standing concern . . . that a criminal defendant might get a pal to confess to the crime the defendant was accused of, the pal figuring that the probability of his actually being prosecuted either for the crime or for perjury was

---

[9] After Peppers' trial, Rule 804(b)(3)(B) was amended, effective December 1, 2024, to read: "if offered in a criminal case as one that tends to expose the declarant to criminal liability, is supported by corroborating circumstances that clearly indicate its trustworthiness after considering the totality of circumstances under which it was made and any evidence that supports or undermines it."

16

slight.'" United States v. Henderson, 736 F.3d 1128, 1130 (7th Cir. 2013) (quoting

United States v. Silverstein, 732 F.2d 1338, 1346 (7th Cir.1984)), see also Morrow, 79

F.4th at 1179–80 (citing the same).

### c. The district court did not abuse its discretion in excluding the investigator's testimony as to Millsap's statements about Peppers' role in the charged offenses

The district court properly deemed Millsap to be unavailable because he

invoked his Fifth Amendment privilege not to incriminate himself. See Morrow, 79

F.4th at 1179. But the court excluded the investigator's testimony because it did not

meet the other two requirements for admission under Rule 804(b)(3)—Millsap's

statements to the investigator were neither against Millsap's penal interest nor were

they sufficiently corroborated to be deemed trustworthy. That was not an abuse of

discretion.[10]

---

[10] The district court primarily addressed the second requirement, that a reasonable person in Millsap's position would not have thought that the statements he made to Peppers' defense investigator would expose Millsap to criminal liability. The court ruled in full:

> Okay. So I am going to find that these statements [Millsap made to Peppers' defense investigator] are not admissible under 804(b)(3) for two reasons. One is I do agree that Mr. Millsap is unavailable, but I don't find that the statements were made against penal interests in the sense that Mr. Millsap would reasonably anticipated [sic]. And part of it is . . . it wouldn't have appeared to me necessarily that the statements to the investigator after a judgment had been entered might expose him to a claim for perjury, and so I don't find that those statements were objectively anticipated . . . to be against interests.
>
> In addition, I do have concerns about the circumstances for many of the reasons that [the prosecutor] identified, but also taking into the light the fact that Mr. [Millsap] . . . had already been sentenced and

Peppers argued that Millsap's statements to Peppers' defense investigator were against Millsap's penal interest because 1) those statements were inconsistent with Millsap's sworn statement to the court, when he pled guilty, that he conspired with Peppers to distribute methamphetamine, thus subjecting Millsap to possible perjury charges; and 2) Millsap's statement that he got marijuana from Peppers exposed him to prosecution for marijuana possession. We will address those two categories of Millsap's statements to the investigator.

### i. Millsap's statements to Peppers' investigator indicating that Peppers was not participating in Millsap's fake methamphetamine distribution

Millsap first made statements to the investigator indicating Peppers was not participating in Millsap's fake methamphetamine sales to the informant. As an initial matter, to be against penal interest for purposes of Rule 804(b)(3), the declarant's statement must inculpate the declarant. See Yellowhorse, 86 F.4th at 1308.

---

received what I think . . . at the time and in hindsight was an incredibly generous sentence [sixty months' probation], it would seem that there is at least some interest or at least some likelihood that Mr. Millsap would have reason to now take blame for the conduct in the hopes of facilitating Mr. Peppers not receiving any punishment for the conduct.

In addition, I think the nature of the discussions that Mr. Millsap allegedly told [Peppers' defense investigator] Ms. Miller as to kind of what Mr. Peppers was doing would also kind of insinuate that Mr. Peppers was at least somewhat familiar with the scheme or conspiracy that Mr. Millsap was engaging in.

So I guess the second and third factors I agree with the government, and I'm going to find those statements are not admissible under 804(b)(3).

(5 R. 382–83.)

18

Millsap's statements to the investigator indicating that Peppers was not involved selling fake methamphetamine do not inculpate the declarant, Millsap. See United States v. Hammers, 942 F.3d 1001, 1010 (10th Cir. 2019) (holding co-conspirator's suicide note, to the extent it stated that the defendant did not have anything to do with the fraud they were accused of committing, was not a statement against the declarant's self-interest). Nor, for that matter, do Millsap's statements that he was selling fake methamphetamine.

Peppers argues that Millsap's statements to Peppers' defense investigator were against Millsap's interest because they exposed Millsap to prosecution for perjury in light of the fact that Millsap, in pleading guilty, stated in a sworn statement that he conspired with Peppers to distribute methamphetamine. The district court was rightly skeptical that a reasonable person in Millsap's position, having already pled guilty and been sentenced for that conspiracy, would have realized he could have been prosecuted for perjury by admitting he was selling fake methamphetamine.

Moreover, Millsap's statements about selling fake methamphetamine were not sufficiently corroborated to be deemed trustworthy. Instead, they were inconsistent with the rest of the evidence presented at trial. Overwhelming evidence indicated that, while Millsap once sold the informant fake methamphetamine, that sale also included real methamphetamine. And, on two other occasions, Millsap sold the informant real, not fake, methamphetamine. Further, Millsap told the investigator that one of the two times Peppers pretended to be Millsap's drug dealer was "the day we all got arrested." (1 R. 145–46.) But that was not accurate.

19

### ii. Millsap's statements to Peppers' investigator indicating Millsap obtained marijuana from Peppers

Millsap also told the investigator that he obtained some marijuana from Peppers for personal use during one of these two occasions and that, any time he was communicating with Peppers on Facebook messenger, they were conversing about marijuana. That statement arguably inculpates Millsap in unlawfully obtaining marijuana. But the district court was again rightly skeptical that a reasonable person in Millsap's position, having already pled guilty to, and been sentenced for, conspiring with Peppers to distribute methamphetamine, would have thought he could have been prosecuted for obtaining marijuana for personal use during the methamphetamine sales. In any event, there is simply no evidence that corroborates Millsap's statement that he obtained marijuana for personal use during a time when Peppers was purportedly pretending to be Millsap's methamphetamine dealer. Nor is there any evidence that Peppers was dealing marijuana.

### iii. Conclusion as to the exclusion of the investigator's testimony about statements Millsap made

For the foregoing reasons, the district court did not abuse its discretion in excluding the investigator's hearsay testimony, proffered under Rule 804(b)(3), as to statements Millsap made regarding Peppers' role in the charged offenses. Most persuasive is that there is no evidence corroborating the trustworthiness of those statements. In response, Peppers asserts only generally that Millsap's statements to the defense investigator should be deemed sufficiently corroborated because they were off-the-cuff, in response to an unexpected phone call from his co-defendant's

investigator; and Millsap had no reason to lie. While those are factors presented to the trial court, they do not overcome the fact that Millsap's statements are inconsistent with the overwhelming evidence presented at trial. Moreover, the district court again rightly questioned the possibility that, because Millsap had already pled guilty and been sentenced, he may have been motivated to help Peppers escape liability for the same conduct. The district court, then, did not abuse its discretion in excluding Peppers' investigator from testifying, under Rule 804(b)(3), as to the statement Millsap made regarding Peppers' role in the charged offenses. We, therefore, AFFIRM Peppers' two 2023 drug-trafficking convictions.

## II.  APPEAL NO. 23-3113

In appeal No. 23-3113, Peppers challenges the revocation of his supervised release imposed for a 2016 felon-in-possession conviction, which the district court revoked because of Peppers' 2023 drug-trafficking convictions. We affirm.

Peppers began serving his three-year term of supervised release term on December 7, 2017. It was, therefore, set to expire on December 7, 2020. While Peppers was still on supervised release, the Probation Office, in August 2020, filed a petition to revoke Peppers' supervised release, alleging Peppers had violated the terms of his release by 1) committing another crime, 2) unlawfully possessing a controlled substance, and 3) associating with someone engaged in a criminal activity. Those alleged violations were based on Peppers' alleged connection to Millsap's methamphetamine distribution in July 2020. Peppers was arrested on the revocation

petition in August 2020, but was then released a few weeks later to await a revocation hearing.

In the meantime, the Government, in November 2020, formally charged Peppers with conspiring with Millsap to distribute methamphetamine. While Peppers was on bail awaiting trial on that federal charge, his three-year term of supervised release for the 2016 felon-in-possession conviction expired. The district court continued to delay his supervised release revocation hearing until the pending drug-trafficking charges were resolved. On the same day, June 15, 2023, in the same proceeding that the district court sentenced Peppers for the two 2023 drug-trafficking convictions, the court also revoked Peppers' supervised release for his 2016 felon-in-possession conviction based on his committing another criminal offense. The court sentenced Peppers to twenty-four months in prison on the revocation, to run consecutive to the sixty-month sentence imposed for the drug-trafficking offenses.

Peppers contends that the district court lacked jurisdiction to revoke his supervised release. This court reviews Peppers' jurisdictional argument de novo. See United States v. Gulley, 130 F.4th 1178, 1183 (10th Cir. 2025).[11]

---

[11] Peppers did not raise this objection in the district court. But, because his argument implicates jurisdiction, the parties agree that this court reviews this issue de novo. That appears to be correct. See United States v. Campbell, 883 F.3d 1148, 1152 (9th Cir. 2018) (reviewing de novo argument, raised for the first time on appeal, that district court lacked jurisdiction to revoke a term of supervised release that had expired).

18 U.S.C. § 3583 governs the situation presented here and provides, in relevant part:

> **(i) Delayed revocation.**--The power of the court to revoke a term of supervised release for violation of a condition of supervised release, and to order the defendant to serve a term of imprisonment . . . extends beyond the expiration of the term of supervised release for any period <u>reasonably necessary for the adjudication of matters arising before its expiration</u> if, before its expiration, a warrant or summons has been issued on the basis of an allegation of such a violation.

18 U.S.C. §3583(i) (emphasis added.)  This "statute provides that the district court's power to revoke an expired term of supervised release depends on two conditions: (1) 'before [the term's] expiration, a warrant or summons [must be] issued'; and (2) 'any period' of delay must be 'reasonably necessary for the adjudication of matters arising before [the term's] expiration.'"  <u>Gulley</u>, 130 F.4th at 1184 (quoting 18 U.S.C. § 3583(i) (alterations in <u>Gulley</u>).[12]

No one disputes that the first requirement is met here.  The Probation Office filed a petition to revoke Peppers' supervised release term in August 2020, four months before his release term was set to expire, in December 2020.

The dispositive question here, then, is whether the delay in revoking his supervised release term was "reasonably necessary."  "Courts have generally taken a practical approach to the determination of what delays are 'reasonably necessary' for purposes of § 3583(i)."  <u>Id.</u> at 1185 (quoting <u>United States v. Morales-Isabarras</u>, 745 F.3d 398, 401 (9th Cir. 2014)).  "[T]he 'underlying consideration is . . . reasonableness with

---

[12]  Relying on case law from seven other circuits, <u>Gulley</u> held that "§ 3583(i) is a jurisdictional statute."  130 F.4th at 1183–85.

respect to the legitimate interests of the defendant and the [G]overnment.' . . . We . . . therefore ask if the delay here was reasonable with respect to the legitimate interests of the parties." Id. at 1185–86 (quoting Morales-Isabarras, 745 F.3d at 401 (9th Cir.)). We conclude that it was.

"Several courts have held it is 'reasonably necessary' to delay revocation until charges relevant to the revocation are adjudicated." Id. at 1186 (first citing Morales-Isabarras, 745 F.3d at 403–04 (9th Cir.); then citing United States v. Madden, 515 F.3d 601, 607 (6th Cir. 2008); and then citing United States v. Ramos, 401 F.3d 111, 117–18 (2d Cir. 2005)); see also United States v. Poellnitz, 372 F.3d 562, 571 (3d Cir. 2004) (holding "it was reasonable for the District Court to wait . . . for adjudication of . . . state charges because it might be relevant in the revocation proceeding"). The same reasoning applies here. Peppers' alleged violations of the conditions of his 2016 term of supervised release were based on the same conduct underlying the drug-trafficking charges that resulted in his 2023 convictions. Under the circumstances presented here, it was not unreasonable for the district court to delay Peppers' supervised release revocation hearing until those pending drug-trafficking charges were resolved. See Morales-Isabarras, 745 F.3d at 402 ("[W]hen the outcome of an ongoing criminal proceeding is directly related to the issue of whether the defendant violated a condition of supervised release, it is 'reasonably necessary' to delay proceedings on the supervised release violation pending resolution of the underlying criminal charge." (first citing Madden, 515 F.3d at 607 (6th Cir.; and then citing Ramos, 401 F.3d at 117 (2d Cir.)).

24

## III. CONCLUSION

For the foregoing reasons, we AFFIRM Peppers' two 2023 drug-trafficking convictions and the revocation of his 2016 supervised release term.